**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MALIBU MEDIA, LLC,<br><br>        Plaintiff,<br><br>   vs.<br><br>JOHN DOE SUBSCRIBER ASSIGNED<br>IP ADDRESS 98.110.51.78,<br><br>      Defendant | **Civil Action No.**<br>3:13-cv-04681-MLC-TJB |

**MOTION AND SUPPORTING BRIEF OF VERIZON SUBSCRIBER, AND
HOUSEHOLD, TO QUASH OR TO MODIFY SUBPOENA AND
<u>MOTION FOR PROTECTIVE ORDER</u>**

TO:      Verizon Legal Compliance      Patrick J. Cerilo, Esq.
                  Custodian of Records          Patrick J. Cerillo, LLC
                  P.O. Box 1001                   Attorneys for Plaintiff
                  San Angelo, TX  76902        4 Walter Foran Boulevard
                  Fax: 325-949-6916           Suite 402
                                            Flemington, NJ  08822
                                            Phone:    908-284-0997
                                            Fax:   908-284-0915
                                            pjcerillolaw@Verizon.net

FROM:    Seth A. Kurs, Esq. (008542004)
            Massar & Kurs, P.A.
            Attorneys for Movant
            379 Princeton Hightstown Road
            Building 1, Floor 2
            East Windsor, NJ  08512-2960
            Phone:     609-448-2500
            Fax:        609-448-2588
            skurs@massar-kurs.com

       Movants, Verizon Subscriber ("Subscriber"), and the Subscriber's spouse (collectively, the "Household"), through counsel, respectfully move for a protective order, <u>see</u> Fed. R. Civ. P. 37(c), as well as to quash or modify a subpoena.

       Rule 3.3(d) of the NEW JERSEY RULES OF PROFESSIONAL CONDUCT applies to *ex parte* filings with courts, including New Jersey federal courts  In most pleadings, lawyers are permitted to act as adversarial advocates, and to emphasize

facts and arguments that they view as most favorable to their client, while downplaying or – in some cases – not even mentioning, unhelpful information.  When a filing is made on an *ex parte* basis, however, there is no adversary to give the Court a more balanced understanding of all the facts. Accordingly, a different and more rigorous standard applies: "(d) In an *ex parte* proceeding, a lawyer shall inform the tribunal of **all material facts** that are known to the lawyer and that will enable the tribunal to make an informed decision, **whether or not the facts are adverse**." NEW JERSEY RPC 3.3(d) (emphasis added).

Thus, Malibu, and its legal counsel, have had a reasonable opportunity to fulfilling their ethical obligation of candor – namely, to drop the advocacy, at least while proceeding *ex parte*, and to tell a few simple truths.

We respectfully invite this honorable court to scour Malibu's submissions for the following candid disclosures (or any words to similar effect):

- An IP address is not a person, and it is a mistake to suppose that an IP address uniquely identifies any particular individual;

- In other BitTorrent litigation, a movie company has conceded an error rate at least as high as thirty (30) percent, when basing allegations of copyright infringement on the supposition that the subscriber and the downloader are one and the same;

- It is possible to have limited discovery take place – including a third-party examination of electronic devices that happen to belong to the Subscriber – on an anonymous basis, without disclosing the Subscriber's identity;

- It is nothing other than speculation, at this time, for Malibu Media to suppose – and to allege in the caption of the case – that the Subscriber and the accused infringer are necessarily one and the same person;

- Malibu Media does not presently know the identity of the accused copyright infringer in this case and does not presently know or have any evidence – one way or the other – as to whether the Subscriber is the accused infringer, or whether the accused infringer is someone else;

- All Malibu presently knows is that a particular IP address was used for certain Internet traffic referenced in the Complaint, and that the block of IP addresses that includes that address, happened to be assigned to Verizon, at the time the traffic was observed by Malibu or Malibu's agent(s);

- If no record or trace of any alleged download is found on any electronic device owned by the Subscriber, then Malibu may never know the identity of the infringer, and it is possible in this case – or any BitTorrent case, for that matter – that the identity of the real infringer may never be knowable;

- Most IP addresses assigned to subscribers by any cable company, are shared by those subscribers over a local area network ('LAN') with multiple individuals, and it is ubiquitous for cable subscribers in the United States to operate wireless LANs;

- More than one person can use an IP address assigned by a cable company, and it has been known to occur that a complete stranger will use an IP address for BitTorrent content, without the subscriber's knowledge or authorization – for instance, but without limitation, by using bandwidth over an open or poorly secured wireless node;

- The actual purpose that identity disclosure serves in these cases for Malibu, relates to the frequency with which cases settle out of court – because Malibu prefers to establish its own price-point for settlements, and disfavors judicial supervision over Malibu's case-processing and collection practices;

- Some of the Malibu content alleged in the Complaint, is made available by Malibu for free and without charge – just not via BitTorrent;

- Any electronic file can be given any file name.  Much like putting book sleeve "A" on book "B", downloading a file with a changed filename, the wrong filename, or same name but different electronic content, Malibu is simply assuming the file is one that is owned by Malibu without any proof.  The Complaint even admits in numbered item #20 "On information and belief," because Malibu has no way of proving that any file, with any File Hash, is truly the file owned by Malibu.  Malibu goes on to admit in #22, that their investigator, IPP Limited only downloaded "one o[r] more bits of each file listed on Exhibit "A".

- All the other Malibu content alleged in the Complaint, can be downloaded on an 'allyou-can-eat' basis by anyone who pays the periodic subscription price for access to the X-Art Website;

- The view that every download or unlicensed copy is automatically considered to be a lost sale, has repeatedly been criticized in the economics literature, and has no empirical support;

- However, even assuming the 'lost sale fallacy' to be true for the sake of argument, every bit of X-Art (Malibu) content alleged in the Complaint – a library now upward of 320 videos (325 according to a search for registrations with the Copyright Office on October 4, 2013) – can be downloaded by any X-Art subscriber for a flat rate;

- Depending on the billing method selected, the price of an X-Art subscription for a month is between $8.32 and $39.95 for unlimited downloads of the entire library from the Website, can be downloaded by anybody paying the monthly

subscription price;"

- In contrast to a $8.32 price for a one-month subscription, Malibu Media would like to have a money judgment for two million, four hundred thousand ($2,400,000.00) dollars ($150,000.00 x 16 files), in this case;

- Malibu Media is aware of roughly how much it would cost for a cable subscriber to mount a defense to copyright allegations through and including trial;

- With that in mind, once Malibu files a lawsuit and serves an identity subpoena, Malibu customarily demands $750.00 **per title** from subscribers caught up in its lawsuits – which is somewhat steeper than the **$8.32** it costs to download the whole X-Art library as licensed content;

- In this case, $750.00 per title multiplied by 16 titles, is $12,000.00 – an amount that is significantly greater than the $8.32 price of a monthly subscription;

- The cable industry, including Verizon, has established a 'six strikes[1]' mechanism to deter unlicensed copying of motion pictures *via* BitTorrent and other methods; (The formal name for the "Six Strikes" policy is the Copyright Alert System).[2]

- The "Six Strikes" mechanism is the result of a deal between the Motion Picture Association of America (MPAA), the Recording Industry Association of America (RIAA), the Independent Film and Television Alliance (IFTA), the American Association of Independent Music (A2IM), and large Internet Service Providers (ISPs) including AT&T, Cablevision, Comcast, Time Warner Cable, and most

---

[1] See, "Has Your ISP Joined the US "Six Strikes" Anti-Piracy Scheme?", https://torrentfreak.com/isp-six-strikes-anti-piracy-scheme-120803/
[2] See, "The Copyright Alert System: Six Strikes and You're Slowed Down", http://www.marketingpilgrim.com/2013/02/the-copyright-alert-system-six-strikes-and-youre-slowed-down.html

notably Verizon.[3]

- Malibu Media could have communicated with Verizon to notify the Subscriber that content presenting a concern for Malibu happened to be traveling over the Subscriber's IP address;

- Malibu Media generally does not request 'six strikes' notices from cable companies to subscribers, but instead has chosen to use a business model that involves accumulating as long a list as possible of alleged downloads, in a spreadsheet, to be included in a lawsuit – precisely because settlements tend to be more profitable for Malibu the more titles can be listed in the spreadsheet attached to a complaint;

- Malibu did not request any 'six strikes' notice to this Subscriber at any other time;

- Had Malibu notified Verizon about their concerns regarding the network activity of Subscriber's assigned IP Address, Verizon and/or the Subscriber would have had an opportunity to investigate any network vulnerabilities or security issues that could permit any unauthorized use (commonly referred to as "leeching") of Subscriber's unsecured wireless network.

- Cases involving Malibu tend to settle, whether or not any subscriber actually did the download, and to settle for significant amounts of money, precisely because the alternative is to pay for a costly legal defense after being named in court papers as an accused 'pirate' of hardcore pornography;

- Malibu Media is certainly aware that one's association with 'porn piracy' in legal papers is known by Malibu to be concomitant with significant social stigma;

- In a similar case venued in the Western District of Michigan, Southern District,

---

[3] See "Copyright Alert System",
http://en.wikipedia.org/wiki/Copyright_Alert_System

Malibu Media, LLC v. John Doe, 1:13-cv-00893-RJJ, when legal counsel for the Subscriber pointed out that the Subscriber would have considerable difficulty – in the face of a nearly $67,000.00 demand – coming up with even the customary legal fee to open a personal bankruptcy case, and suggested the use of a third-party investigator to confirm for Malibu that the Subscriber has limited assets, Malibu's legal counsel responded: "Eric, This isn't possible. My client has developed a sophisticated analysis for these purposes which not only include a basic current asset search but also looks at the Defendant's earning power over a 20 year period, the strength of our evidence when correlated to the subscriber household, whether the Defendant is sophisticated within the realm of IP (you'd be surprised how many IP lawyers end up as Defendants themselves), as well as a host of other factors."

There's quite a bit for Malibu to disclose, in candor, about its business and collection practices, and all of it conspicuously has been left out of Malibu's *ex parte* papers.

Moreover, Malibu's *ex parte* filings not only omit material information, at least some of which is ethically required to be disclosed, but Malibu's pleadings – starting with even the caption – are actively and intentionally deceptive. Malibu continues to attempt to mislead court after court – in the very caption of each case it files – into buying the myths (i) that an IP address uniquely identifies a person, and (ii) that the subscriber is <u>always</u> the downloader.

This honorable Court may remember the notable story of Malcolm Riddell, who owned a condominium near the water in Florida. Federal law enforcement officials, making the same mistake (assuming that an IP address uniquely identifies a person, and that all one needs to do is to secure the

subscriber's identity to catch the culprit), persuaded a Florida federal judge to issue a warrant.  They entered Riddell's condominium using that warrant and questioned him about child pornography, with firearms displayed.  As it turns out, Riddell was not the downloader; it was somebody else on a boat in a nearby marina, equipped with a laptop and a Pringles® can, converted into an antenna. Riddell's case is hardly unique.

This honorable court may also remember the notable story of a homeowner asleep in his home in New York, when federal ICE agents forcibly entered the man's home with weapons drawn, forcing the homeowner to the ground, referred to as a pedophile and taken into custody for questioning.  Only later was it learned that the homeowner was not the target of their investigation, instead it was a college student living nearby that was leeching from the homeowner's wireless network.  The Honorable Harold A. Baker, U.S.D.J., wrote in the Court's opinion, "The infringer might be the subscriber, someone in the subscriber's household, a visitor with her laptop, a neighbor, or someone parked on the street at any given moment."

When Malibu is proceeding *ex parte*, it is imperative that Malibu err on the side of candid disclosure, rather than erring on the side of zealous advocacy – even to the extent of overzealousness.

Attorney, Eric C. Grimm, of the Law Firm of Williams Hughes, PLLC, Attorneys for a similar defendant in the matter of Malibu Media, LLC v. John Doe, 1:13-cv-00893-RJJ wrote in a Motion and Supporting To Quash or Modify Subpoena and Motion for Protective Order, wrote, "We have had similar experiences in the past with lawyers who now represent Malibu – episodes in which these attorneys not only overzealously have gone up to the line, but even crossed over it. Malibu's litigation, collectively, is run out of Florida by M. Keith Lipscomb, although Paul Nicoletti is the

local attorney who appeared for Malibu in this case.  Attached as Exhibits 3 and 4 to this motion, are the text of two letters written to Lipscomb, on behalf of falsely-accused cable subscribers, who did no download whatsoever. "[4]

Lipscomb was not the first to start filing BitTorrent copyright lawsuits in the U.S. (the phenomenon started in the U.K.).  Dunlap Grubb & Weaver – mostly acting on behalf of legitimate non-porn movie companies, such as Kathryn Bigelow's production company, got the copyright trolling[2][5] ball rolling in the United States. Bigelow's movie The Hurt Locker, was not even the first movie to be involved in a mass "troll" lawsuit filed by DG&W.

It was some time later, a year or more, that porn companies – most notably Larry Flint Productions (initially represented by a Texas lawyer, Evan Stone) – started hopping on board the mass copyright "trolling" mass litigation bandwagon.  Lipscomb started filing such suits sometime after Stone, but Lipscomb's big innovation was to start using an unusual procedure in Florida **state** court called an "equitable bill of discovery" in an effort to bypass an increasingly skeptical federal judiciary on the

---

[4] The work product of Mr. Eric C. Grimm filed in a separate case, <u>Malibu Media, LLC v. John Doe</u>, 1:13-cv-00893-RJJ was crafted so eloquently, and thoroughly researched, a special thank you and credit is due to Mr. Grimm, who permitted the undersigned to use and modify his brief for the use of the Movant in the instant case.

[5] Words, unless they become legal terms of art, come mean what ordinary people mean when using them.  <u>See</u>, <u>e.g.</u>, < http://public.oed.com/aspects-of-english/english-in-use/ > (methodology of understanding meaning of words, starts with examining how they are actually used).  Ordinary and frequent users of the term "copyright troll" would include such critics of Mr. Lipscomb as Internet bloggers Die Troll Die, and Fight Copyright Trolls, not to mention organizations with a more formal communication style, such as the Electronic Frontier Foundation, a civil liberties NGO.  The label "copyright troll" certainly was applied, for instance, to film maker Kathryn Bigelow (who certainly was <u>not</u> a "non-practicing entity" when she filed her mass copyright lawsuits in D.C.), long before Malibu Media started attempting to monetize BitTorrent traffic through litigation.  We are entirely comfortable, in light of how the term "copyright troll" has been in use for years, with including Malibu in this category. Although there may be <u>even worse</u> copyright trolls – such as Righthaven and Prenda Law – than Malibu, that certainly does not diminish the obvious badness of Malibu's overzealous business model.

subjects of joinder and subscriber identity discovery   The attorney involved in representing the Subscriber in that lawsuit, promptly pointed out to Lipscomb, when his strategy started popping up in 2011, that the "equitable bill of discovery" theory went beyond the bounds of fair legal argument, because the Florida state courts lacked subject-matter jurisdiction to entertain such requests in copyright cases.

Mr. Grimm noted in his moving papers that "When these issues were pointed out to Lipscomb by letter, he did not change his trolling methods.   Rather, it took judicial rulings by Florida judges, some months later, to shut down that particular pattern of abuses. "  Mr. Grimm also noted in his moving papers that:

> "Lipscomb and Nicoletti have this year been given multiple chances to start fulfilling their duty of candor to Michigan's federal courts, when seeking identity subpoenas on an *ex parte* basis.   We respectfully suggest that this problem will not be corrected (let alone correcting all the shenanigans that happen in the out-of court settlement process, especially with unrepresented targets) unless and until either this honorable Court or the U.S. District Court for the Eastern District of Michigan, or both, intervene to start taking a close and careful look at what Nicoletti, Malibu, and Lipscomb really are doing. "

It certainly appears that Malibu Media, LLC is utilizing the same methodologies when filing suit in New Jersey, thus strengthening the argument and position that until the courts put a stop to these actions, Malibu Media, LLC, and their progeny will continue to prey upon individuals that are incapable of funding prolonged litigation, anticipating that the embarrassment and stigma of litigation regarding pornography will hasten an unjust settlement, even when no real evidence exists to identify any single individual.

Remember, Malibu does not care whether it receives money from any actual downloader, or just from an innocent cable subscriber who prefers not to be associated in court filings with pornography.  Mr. Grimm also wrote, "Notably, in the Steven Moxley case, Lipscomb's operation came back and attempted to threaten

litigation, even after being informed that neither Moxley nor anyone authorized to use his network, had done any downloading.  And Moxley's is hardly the only case, in our direct experience, in which Lipscomb and/or Nicoletti engaged in significant over-reach, to attempt to squeeze a non-downloader."

It is precisely as a result of such experiences dealing with the Lipscomb trolling enterprise[6], as well as encountering dramatic inflation in settlement demands from them, that we have changed our approach to processing cases, and now emphasize never revealing <u>any </u>information about a Subscriber (whether downloader or not), if it can be avoided.

The Household, accordingly, respectfully suggest, and pray, that this honorable Court quash the prior subpoena in this case, so as to require Malibu to come back to court with a presentation that actually accomplishes what NEW JERSEY RPC 3.3(d) required Malibu to do in the first place – namely, making a balanced and candid disclosure of all the <u>bad</u> facts that cut against their motion and their business model.

---

[6] We are aware of Lipscomb's PR-focused insistence that he is not a "copyright troll." His argument (which he has induced one judge mistakenly to accept) is based on a fallacy – that copyright and patent are the same.  They are not.  The phenomenon of "patent trolls" or "Patent Assertion Entities" (PAEs) has come to be defined by the observation that PAEs tend not to practice the art disclosed in the patents that serve as the basis for their lawsuits. "Copyright trolling," at present, is not a legal term of art, but a phrase that came into use in connection with the activities of ACS:Law, in Great Britain (which later resulted in an investigation of ACS:Law's trolling activity by the Solicitors Regulation Authority). Whether a copyright owner actively publishes and licenses the content that it sues over (as Uwe Boll, Kathryn Bigelow, and some of the pioneer BitTorrent trolls in the U.S. courts, clearly did), is not a defining issue, but merely one factor among many to consider.  The real standard is whether a litigation strategy serves merely to exploit the happenstance that Congress has enacted draconian penalties in this particular statute, or whether enforcement activity actually promotes the progress of science and the useful arts – which is the very reason why copyright exists. Pornography, in particular, is arguably a harmful product/service like cigarettes or casino gambling that exploit addiction.  We are not aware of any reason to believe that any of the content published by Malibu under the trade name X-Art, promotes the progress of science and the useful arts in any way, rather than merely appealing to a purient interest, <u>see Miller v. California</u>, 413 U.S. 15 (1973), and nothing more.

We also respectfully suggest that very little discovery has been done so far into Malibu's business practices, despite the many cases filed by Malibu around the country.  If Malibu wants to maintain this case – as opposed to moving on to greener pastures – then perhaps this case presents a good opportunity for the Court to get a good look behind the curtain, and to see what Malibu really is doing, by allowing the Subscriber limited and focused discovery into Malibu's business practices, before the issue of identity is addressed.

This honorable Court has the authority to control the timing and sequence of discovery.  Verizon Subscriber respectfully prays that – this time around – the issue of identity be set aside temporarily, while limited discovery is taken from Malibu, to enable this honorable court to understand what is happening in the aggregate with all the lawsuits that Malibu has been filing, and whether Malibu's say-so really is enough for a subpoena.

Your honor, please make them adhere to the governing rules, including the rule requiring heightened candor in *ex parte* proceedings, and the rules governing the evidentiary showing that must actually be made in order to justify an identity subpoena.

## CERTIFICATE OF COUNSEL

I certify that I sought in good faith to confer with counsel for the Plaintiff, prior to filing this Motion for Protective Order.  Opposing counsel do not concur in the relief sought.

Respectfully submitted,

November 27, 2013                    __/s/ Seth A. Kurs_____

Seth A. Kurs, Esq. (008542004)
Massar & Kurs, P.A.
Attorneys for Movant
379 Princeton Hightstown Road
Building 1, Floor 2
East Windsor, NJ  08512-2960
Phone:        609-448-2500
Fax:            609-448-2588
skurs@massar-kurs.com

Motion to Quash and for Protective Order,
In Malibu Media, LLc v. John Doe
Subscriber Assigned IP Address 98.110.51.78
C.A. No. 3:13-cv-04681-MLC-TJB

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MALIBU MEDIA, LLC, <br><br> Plaintiff, <br><br> vs. <br><br> JOHN DOE SUBSCRIBER ASSIGNED IP ADDRESS 98.110.51.78, <br><br> Defendant | **Civil Action No.** <br> 3:13-cv-04681-MLC-TJB |

TO:          Verizon Legal Compliance        Patrick J. Cerilo, Esq.
                Custodian of Records             Patrick J. Cerillo, LLC
                P.O. Box 1001                      Attorneys for Plaintiff
                San Angelo, TX 76902        4 Walter Foran Boulevard
                Fax: 325-949-6916             Suite 402
                                                       Flemington, NJ 08822
                                                   Phone:       908-284-0997
                                                   Fax:    908-284-0915
                                                   pjcerillolaw@Verizon.net

FROM:      Seth A. Kurs, Esq. (008542004)
                Massar & Kurs, P.A.
                Attorneys for Movant
                379 Princeton Hightstown Road
                Building 1, Floor 2
                East Windsor, NJ 08512-2960
                Phone:       609-448-2500
                Fax:           609-448-2588
                skurs@massar-kurs.com

**MEMORANDUM IN SUPPORT OF VERIZON SUBSCRIBER**
**TO QUASH OR TO MODIFY SUBPOENA AND**
**MOTION FOR PROTECTIVE ORDER**

       As recent experience with the Federal Intelligence Surveillance Act Court helps

illustrate (indeed, the FISA Court itself has been raising concerns about submissions

to that Court by the Justice Department since at least the late 1990s), adversarial

processes tend to develop a record in a more balanced manner, and to promote better

decision-making by courts. It is not always possible to test issues in the crucible of

adversarial litigation, however, which is why – when no substitute exists for an *ex parte* filing – an ethical obligation and duty of heightened candor applies. <u>See</u> NEW JERSEY RPC 3.3(d).

BitTorrent copyright cases, in particular, help illustrate how outcomes can be dramatically different, when well-qualified advocates present both sides (instead of just one side's advocacy) to a court. When the issues in a BitTorrent lawsuit receive proper, adversarial, briefing, and the judge can have the benefit of all the facts and the law – rather that the one-sided and distorted advocacy perspective offered only by the copyright plaintiffs – outcomes have been known to turn out somewhat differently. <u>E.g.</u>, Order (Oct 10, 2010) (Doc. Ent. 3) (order requiring public interest counsel to brief subpoena-related issues as *ad litem* attorneys), *in* <u>Mick Haig Productions, e.K. v. Does 1-670</u>, No. 3:10-cv-01900-N (N.D. Tx. *filed* Sep. 21, 2010), *subsequent proceeding*, 2011 WL 5104095 (N.D. Tex. Sep. 9, 2011), *aff'd*, 687 F.3d 649 (5th Cir. 2012) (describing business model of lawyer representing pornographic movie companies as a "strategy of suing anonymous internet users for allegedly downloading pornography illegally, using the powers of the court to find their identity, then shaming or intimidating them into settling for thousands of dollars – a tactic . . . employed all across the state and that has been replicated by others across the country"); <u>see also AF Holdings, LLC v. Ciccone</u>, 4:12-cv-14442-GAD-MKM (E.D. Mich. *filed* Oct. 7, 2012) (lawsuit seeking identities of 300 cable subscribers dismissed in its entirety, after defense counsel provide court with more balanced information). We are optimistic that the Court, if it takes the opportunity in this case, to get all the facts about Malibu Media, may understand the case somewhat differently than it would based solely on the one-sided presentation made so far by Malibu. Indeed, if this honorable Court does just one thing – namely, requires Malibu to come forward with

<u>evidence</u> (rather than speculation ) on the subject of the identity of the accused infringer, we suspect there will be no subpoena.

It is important to recognize that almost every public venues from Starbucks to McDonalds, restaurants, hospitals, and even the New Jersey Superior Court System, offer free wireless access to their visitors.  Using Malibu's model of assuming the subscriber is the downloader, the State of New Jersey would be the defendant in each and every case in which anyone, in or near any State Courthouse downloaded any file Malibu <u>believes</u> is owned by them.  This methodology is clearly defective, and Malibu is certainly aware of this.

When the first U.S. round of non-porn "copyright troll" lawsuits were filed in the District of Columbia, motions to quash were quite common.  Counsel for the defense, at that time, were not fully aware of the rate of "false positives," in these cases (a rate that one lawyer representing porn companies has revealed to be as high as 30%; our own estimate based on a sample of over 100 defendants in these cases, is more in the range of 50%), and the arguments ruled-on by the federal trial court in D.C., did not reflect a current (2013) and up-to-date understanding of all the issues involved in mass copyright litigation. Unfortunately, those early decisions often still continue to be followed even though the level of understanding by everyone (including the courts) has increased over time.

We respectfully suggest that it is time to revisit the subject of how the process of obtaining subpoenas should work (with particular emphasis on the duty of heightened candor, in *ex parte* proceedings), and that this case would represent a good opportunity for this Court to review all the issues in a fresh light, as well as to send a message to Malibu and other potential litigants, that the Court is going to start taking a more active role in each case, before just allowing subpoenas to be issued as

Motion to Quash and for Protective Order,
In Malibu Media, LLc v. John Doe
Subscriber Assigned IP Address 98.110.51.78
C.A. No. 3:13-cv-04681-MLC-TJB

a matter of course.

Another suggestion we would respectfully make, is for the Court regularly to start appointing *ad litem* counsel – just as was done by the Dallas court in the <u>Mick Haig</u> case – so as to ensure that the important decision whether an identity subpoena ought to be issued, can be a well-informed decision. Practically speaking, once identity is disclosed, even if the subscriber is innocent, these cases tend to settle, because few accused subscribers (even falsely accused ones) really want to go through the public ordeal of copyright litigation.

What this means is that, for all practical purposes, the judge's signature on the identity subpoena authorization order tends to amount effectively to a delegation of the judicial role to Plaintiff's counsel. They then arrogate to themselves the judge's role of deciding how much each case is worth (reportedly, a sophisticated calculation involving the next 20 years' earnings of any putative defendant, along with all the target's collectable assets), and elect to decide in an typically overzealous way, what is "fair" to impose as a punishment on a cable subscriber who may or may not have deprived Malibu Media of as much as $8.32 in subscription fees.

Compare that with what ordinarily are considered "draconian" consequences in drunk driving cases, involving criminal prosecutions. The fines in a drunk driving case are expensive, but pale in comparison to what Malibu demands for the download of even a handful of movies, for personal use, over BitTorent. A drunk driving conviction can seriously disrupt the life of the accused for months, or even as much as a couple of years. But Malibu seems to think it is fair and just to climb on a cable subscriber's back (whether or not the subscriber did the download), and not let go for the next 20 years.

Does Malibu do this because Malibu is imminently threatened with going out of

business due to BitTorrent?  Hardly. Malibu recently disclosed some (but hardly all) of its financials for advocacy purposes, at a rare and unusual trial conducted in Pennsylvania.   Malibu's revenues are increasing, not declining, Malibu has disclosed. And settlements in copyright lawsuits, according to Malibu, represent substantially less than half of Malibu's revenue. The X-Art website, says Malibu, is enormously profitable.

That's hard to do. There has been a huge shakeout in the Internet porn industry. That shakeout started in roughly the 2007-2009 time period.  It did not coincide with the launch of BitTorrent in 2001, nor with the high point in Bittorrent's share of total Internet traffic.[7] Rather, the shakeout in the Internet porn industry coincided with the launch and ascendance of free-view "tube" sites, such as Youporn and Redtube.  Malibu Media ought to inform this honorable Court of the impact of "tube" sides, on the Internet porn industry generally, rather than exaggerating the BitTorrent issue.

Especially if X-Art (Malibu) is highly profitable, and its profits from its website, not from lawsuits, continue to increase (as Malibu claims), despite being launched in the post-tube era, perhaps Ms. Field really is less interested in averting the bankruptcy of X-Art (which, by every indication, does not appear imminent, to say the least), and more interested in funding what her Twitter feed suggests is a rather expensive lifestyle.

---

[7]  It is helpful to note that the BitTorrent protocol originated in 2001, and first began being used in July of that year. By 2004, a third of all Internet traffic consisted of torrents. See < http://en.wikipedia.org/wiki/BitTorrent >. (Remember, torrents have a myriad of entirely legal uses).  According to Wikipedia, "In November of 2004, BitTorrent was responsible for 35% of all Internet traffic.  As of February 2013, BitTorrent was responsible for 3.35% of all worldwide bandwidth, more than half of the 6% of total bandwidth dedicated to file sharing."  A drop from a 35% share of all bandwith in 2004, to 3.35% today, is significant, and hardly suggests that BitTorrent really is the threat that Colette Field and Malibu make it out to be.

Another subject that perhaps requires more factual disclosure from Malibu is the connection between the 2013 Internet porn industry including Malibu Media (this is not, mind you, not about still pictures delivered over a dial-up connection), and the increasingly better-understood science of addiction and the human brain.  Indeed, a Cambridge University researcher recently has conducted a study involving the use of medical scanning technology to measure neural activity in the brains of subjects aroused by Internet pornography, and compared those scans with brain scans of drug and alcohol addicts.  See Eleanor Mills & Jon Ungoed-Thomas, *Brain scans find porn addiction*, The Sunday Times (Sept. 22, 2013), < http://www.thesundaytimes.co.uk/sto/news/uk_news/Society/article1317209.ece >; see also Norman Doidge, *Brain scans of porn addicts: what's wrong with this picture?*, THE  G  U  A  R  DIAN  (September  26,  2013),  < http://www.theguardian.com/commentisfree/2013/sep/26/brain-scans-porn-addicts-sexual -tastes >.  This work appears to corroborate some other explanations on the science of addiction brain mechanisms as applied to Internet pornography.  See < http://www.youtube.com/watch?feature=player_embedded&v=wSF82AwSDiU >;  < http://yourbrainonporn.com/ >.  Malibu really ought to provide better and more candid information, about what it does to study its customers' browsing and arousal patterns. We respectfully suggest that this honorable Court deserves to know why Malibu – unlike the legitimate motion picture industry – goes after persons just making unlicensed copies for personal use, rather than targeting people attempting to profit commercially off of sales of unlicensed copies.  It is also worth inquiring whether Malibu ever has attempted to focus its attention on "patient zero" – the initiator of a torrent, rather than trying to maximize the number of lawsuits against all the participants in a torrent, collectively.  Disclosure from Malibu of whether it ever takes

any steps to use DMCA notices, "six strikes" escalation, or other quicker and more-balanced means to combat torrents, rather than just sitting back and passively watching for as long as possible, in order to pad its litigation spreadsheets with extra targets and extra downloads for each target, might be of interest.  Also interesting would be a disclosure from Malibu of whether Malibu ever has seeded a torrent, or had a contractor or affiliate seed a torrent, or ever operated a "honeypot."

Under Rule 37(c) of the FEDERAL RULES OF CIVIL PROCEDURE, this honorable Court enjoys broad leeway to manage this scope, timing, and sequence of discovery, including the issuance of orders:

    A. Forbidding the disclosure or discovery
    B. Specifying terms, including time and place, for the disclosure or discovery;
    C. Prescribing a discovery method other than the one selected by the party seeking discovery;
    D. Forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters;
    E. Designating the persons who may be present while the discovery is conducted;
    F. Requiring that a deposition be sealed and opened only on court order;
    G. Requiring that a trade secret or other confidential research, development, or commercial informant not be revealed or be revealed only in a specified way; and
    H. Requiring that the parties simultaneously file specified documents or information in sealed envelopes, to be opened as the court directs.

FED. R. CIV. P. 37(c) ("The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense…").  The court's powers include, but are not limited to, the above list of examples.  Id.

We respectfully suggest that the more informative way to proceed with discovery – given the infrequent rate at which discovery actually is taken from the tiny handful of "adult entertainment" companies that are filing most of the mass copyright lawsuits all over the country – **most such companies file no lawsuits** – is for the Court to exercise control over the timing and sequence of discovery, by allowing the

Plaintiff answer some questions first, this time, and developing a more candid picture of what's really going on with Malibu.

At a minimum, the present subpoena ought to be quashed until such time as Malibu can be bothered to submit a subpoena request that actually fulfills the heightened candor requirement of NEW JERSEY RPC 3.3(d).  But the Household respectfully suggests that any and all of the topics, referenced above, ought to be covered, in fairness and candor.

Moreover, it bears mentioning that the U.S. Constitution contains the founders' reason for recognizing copyright in the first place.  The reason why Congress has the power "for limited times" to "secur[e] . . . to Authors and Inventors the exclusive Right to their respective Writings and Discoveries," is "[t]o promote the Progress of Science and useful Arts," not to protect the business and revenue model of pornographers and their contingent-fee lawyers.  We continue waiting for some explanation – any explanation at all – for what X-Art, Malibu Media, or the pornography industry generally, ever has done to "promote the Progress of Science and useful Arts."

Although Malibu / X-Art hires very expensive models, uses high-end digital recording equipment, and selects sets that convey a sense of wealth and luxury, in reality the content published by X-Art contains little, if anything, other than very graphic depictions, including close-up shots, of genitalia, sexual intercourse, and other behaviors customarily depicted in any "hardcore" pornography.  Under the Miller test, X-Art's content is obviously calculated to appeal to a prurient interest.  And, far from having any "serious literary, artistic, political, or scientific value," essentially all Malibu's content does is to appeal to the prurient, in order to induce a state of sexual arousal in its intended viewers. This can hardly be what the Framers had in mind when they used the phrase, "the Progress of Science and useful Arts." In other words,

pretty-people hardcore, is still hardcore, and there's a growing body of evidence that this stuff has a negative overall impact on society, as well as distorting the sexuality of individual viewers, rather than promoting healthy sexuality.  Indeed, the negative social consequences of consuming this harmful product, <u>see</u>, <u>e.g.</u>, < <u>http://blog.ted.com/2009/12/02/cindy_gallop_ma/</u> >, appear to scale up, like the adverse health effects of tobacco, the more the harmful product is consumed.

The Michigan Court of Appeals, in <u>Thomas M. Cooley Law School v. John Doe 1</u>, __ N.W.2d __, 2013 WL 1363885, at V.B - V.C (Mich. Ct. App. Apr. 4, 2013), recently explained how the careful crafting of a protective order, could enable a case to be litigated all the way through the summary disposition stage, without revealing the identity of the "Doe" in that case.  Similar safeguards easily could be crafted, especially with counsel involved who have experience with protective orders in a variety of contexts, to address many issues without simply disclosing the Subscriber's identity based on nothing more than the Plaintiff's speculation and say-so. Movants pray for appropriate protection.

Respectfully submitted,

Dated: November 27, 2013              __/s/ Seth A. Kurs_____

Seth A. Kurs, Esq. (008542004)
Massar & Kurs, P.A.
Attorneys for Movant
379 Princeton Hightstown Road
Building 1, Floor 2
East Windsor, NJ  08512-2960
Phone: 609-448-2500
Fax:    609-448-2588
skurs@massar-kurs.com

## CERTIFICATE OF SERVICE

I certify that the foregoing Motion to Quash or Modify Subpoena, and Motion for Protective Order, was filed through the Court's ECF system on November 27, 2013, and that it is being automatically served on all counsel of record through the ECF system.

Respectfully submitted,

Seth A. Kurs, Esq. (008542004)
Massar & Kurs, P.A.
Attorneys for Movant
379 Princeton Hightstown Road
Building 1, Floor 2
East Windsor, NJ  08512-2960
Phone: 609-448-2500
Fax:    609-448-2588
skurs@massar-kurs.com